FILED - USDC -NH
2022 DEC 23 PM 2:47

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

LEO A CULLINAN,

Plaintiff

v.

CATHOLIC MEDICAL CENTER;

GRANITE ONE HEALTH;

JOSEPH PEPE, Medical Doctor, CEO, President;

ALAN FLANIGAN, Medical Doctor;

HOLLI HOLBROOK, Registered Nurse;

UNKNOWN, "Charge Nurse";

ALBANESE, LEIGH-ANN, Registered Nurse;

UNKNOWN, Patient Liaison;

STEPHEN SAGE, Security Guard;

ALBERTO OYOLA, Security Guard;

JAMES DEROCHE, Security Guard;

ZACKERY CHIVELL, Security Guard;

DANIEL MONTOYA, security Guard;

EDWARD WELLS, security Guard;

PARKLAND MEDICAL CENTER;

ALI KHAIRAT, Medical Doctor;

LARRY KESSLER, Medical Doctor;

MADISON FIASCONARO, Medical Doctor;

THOMAS GALLAGAR, Medical Doctor;

UNKNOWN GALTH, Medical Doctor,

UNKNOWN, Intake Nurse;

MANCHESTER POLICE DEPARTMENT;

ALLEN ALDENBERG; Chief of Police;

AUSTIN BIERY, Detective;

ROGERIO DIAS, Patrol Officer;

RYAN GARLAND, Patrol Officer;

BRENDAN LANGTON, Detective;

UNKOWN NOCELLA, Detective;

MAX CASTRICAL, Records Officer;

STEPHEN BATES, Detective;

### VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELEIF

1. Introduction

2. This is a federal civil action arising out of the Emergency Medical Services and Active Labor Act, filed by Plaintiff LEO CULLINAN, a disabled citizen of the United States, alleging 32 violations resulting in civil infractions, whereby PLAINTIFF seeks injunctive and declaratory relief, as well as monetary damages for each of the 32 infractions provable on their face PRIMA FACIE

3. This is a federal civil action stemming from EMTALA violations which also violated PLAINTIFF's right to not be discriminated against on the basis of his disability, and to have reasonable accommodations made for said disability, and refusing to treat PLAINTIFF, and even assaulting PLAINTIFF with a loaded weapon, used to threaten and intimidate disabled PLAINTIFF on and off public property, in order to prevent PLAINTIFF from enjoying a federally funded program and service intended to benefit him; WHEREFORE, Plaintiff is also seeking injunctive and declaratory relief as well as monetary

damages pursuant to Title II of the Americans With Disabilities Act, and Section 504 of the Rehabilitation Act of 1973

4. This is a federal civil MEDICAL MALPRACTICE CLAIM arising out of 32 EMTALA violations against PLAINTIFF, which resulted in severe and permanent injury, loss, and nearly the death of PLAINTIFF, who will never again be the same or made whole physically, mentally, or emotionally, and is now scared to be at a hospital due to Post-Traumatic Stress symptoms directly related to PLAINTIFF's violent and shocking experience at CATHOLIC MEDICAL CENTER in Manchester, New Hampshire. PLAINTIFF seeks monetary damages, injunctive, and declaratory relief, as well as attorney fees and litigation expenses

5. This is a federal civil action alleging CONSPIRACY TO VIOLATE CIVIL RIGHTS, and retaliation against a litigating PLAINTIFF for blowing the whistle on CATHOLIC MEDICAL CENTER and MANCHESTER POLICE DEPARTMENT employee DEFENDANTS, and attempting to obtain un-redacted medical records, which are part of PLAINTIFF's Social Security Disability Income CLAIM, resulting in falsified police reports being filed, for false probable cause, in order to get a warrant issued for PLAINTIFF's arrest, and illegally search and seize PLAINTIFF's I-PHONE 13, in order to attempt to hide evidence of security staff DEFENDANTS, recorded assaulting PLAINTIFF with a deadly weapon on and off hospital grounds. PLAINTIFF seeks injunctive and declaratory relief, and monetary damages pursuant to 18 USC Sub-Section 241

6. This is a federal civil RICO Act suit, alleging a pattern of predicate acts of racketeering against PLAINTIFF and the federal government via PLAINTIFF's MEDICAID/MEDICARE, which is funded by the federal government, as well as predicate acts of interrelated FRAUD, by way of billing for services PLAINTIFF never received, entering false assessments into the computer database that never took place, as actual assessments and medical services were being performed at a completely separate facility, multiple towns away, as can be and has already been, quite easily proven on its face, as seen and provided in support exhibits submitted with this CLAIM as exculpatory for the purposes of SUMMARY JUDGEMENT on PRIMA FACIE facts which substantively make up the CLAIM, and are its very foundation.

As such, PLAINTIFF seeks injunctive and declaratory relief, as well as monetary compensatory damages

7. This is a federal civil action alleging HIPAA violations, which have injured PLAINTIFF in a multitude of ways which still do have a negative affect that is assaultive to PLAINTIFF's rights, and willfully neglectful, intentional misrepresenting PLAINTIFF's medical conditions and falsely billing the federal government through PLAINTIFF's provider for services nor rendered during times PLAINTIFF has solid proof of not even being there, but elsewhere. PLAINTIFF therefore seeks injunctive and declaratory relief, as well as monetary damages for infractions able to be recovered in this CLAIM

8. This is a civil action alleging violations of PLAINTIFF's 14th, 8th, 4th, 1st, and 5th Amendment rights to equal protection under law, PLAINTIFF's rights to be treated for a medical emergency, and not be discriminated or retaliated against in ways that cause PLAINTIFF to be restrained illegally from a life-saving emergency medical service facility, or have his property stolen in illegal search and seizures which further accost and retaliate against him, violating his rights to petition the courts by turning the courts and governing authorities into a weapon, and subsequently led to a false arrest for exercising said rights. As such, PLAINTIFF asserts that CMC and MPD DEFENDANTS have weaponized governing authorities which further deprives PLAINTIFF if his basic human rights and liberties that are guaranteed to him by the United States Constitution. As such, PLAINTIFF seeks declaratory and injunctive relief, as well as monetary damages for pains, losses, injuries, and hardships incurred as a result

## II. JURISDICTION

9. Jurisdiction of this Court is invoked pursuant to 28 USC Sub-Section 1331 in that this is a civil action arising under the Constitution of the United States

10. Jurisdiction of the court is invoked pursuant to 18 USC 1962 in that this is a civil RICO Action which seeks to redress the deprivation of PLAINTIFF's rights to be free from predicate acts of assault,II intimidation, and fraud that causes damage to his freedom, reputation, business, finances, body, family, and mental and emotional health. PLAINTIFF alleges false arrest,

illegal search and seizure, assault, retaliation for exercising constitutionally protected/guaranteed rights, and seeks compensatory treble damages as well as attorney fees, and declaratory and injunctive relief

### III.  PARTIES

11. PLAINTIFF, LEO CULLINAN was at all times relevant a Medicaid/Medicare recipient who was a third-party beneficiary of contracts between DEFENDANT entities CATHOLIC MEDICAL CENTER, PARKLAND MEDICAL CENTER, and MANCHESTER POLICE DEPARTMENT DEFENDANTS who did violate PLAINTIFF's rights, and are currently still doing so in all of the following ways described within the statement of facts which are substantive to this CLAIM

12. All DEFENDANTS listed and named in this CLAIM did conspire and coerce to violate PLAINTIFF's rights and are currently still getting away with it, as PLAINTIFF is still not in possession of his phone, medical records in full, and is in court fighting false charges stemming from blatantly falsified reports which paint PLAINTIFF as someone he is not, while saying and doing the exact things PLAINTIFF is now charged with and innocent of, and is currently under attack in his freedom, family, business, and person

13. Additional DEFENDANTS may be added to this, as PLAINTIFF has had multiple interactions with several UNKNOWN MANCHESTER POLICE officers who are not telling PLAINTIFF where his phone is or why it is not being returned, or who is in possession of it, currently, and fears further falsehoods could soon be concocted against PLAINTIFF, as PLAINTIFF has had everything taken from him, and cannot do anything but litigate for it back

## STATEMENT OF FACTS

1. On the evening of September 3rd, 2022, at or around 9:00 pm, PLAINTIFF was violently attacked and assaulted.
2. PLAINTIFF was assaulted by several deadly weapon wielding individuals, and struck in the side of the skull with a large metal stanchion pipe stand that weighed well over forty pounds just at the bottom of the disc shaped base the pipe is welded to in order to make it stand up straight, and this was swung at PLAINTIFF with such force, that when it struck his skull, PLAINTIFF immediately went down and struck his head again on the concrete beneath his feet
3. PLAINTIFF was also with a friend, who was struck in the face and skull with said same weapon, and required facial reconstructive surgery as a result

4. PLAINTIFF upon going down was also kicked in the chest, back, ribs, and body, by multiple assailants shod feet

5. 911 was called by a concerned business owner, who had gotten in between PLAINTIFF and assailants making attempts on taking PLAINTIFF's life

6. Police were made aware of the situation when they arrived at the scene, and EMT's had recorded PLAINTIFF's vitals at approximately 10:25pm

7. PLAINTIFF was concussed, unable to breath, and was falling in and out of consciousness, and was bleeding profusely from his wounded skull

8. PLAINTIFF was showing signs of shock, vomiting blood and bile, dizzy, nauseous, unable to see straight or communicate things properly.

9. PLAINTIFF arrived at CATHOLIC MEDICAL CENTER in Manchester, New Hampshire at approximately 10:40pm in the back of an ambulance, and was unable to breath, and believed he was dying

10. PLAINTIFF was unloaded from the ambulance, on a gurney, strapped for safety, and pushed through DEFENDANT CATHOLIC MEDICAL CENTER doors and into the ER at 10:44pm

11. DEFENDANT HOLLIE HOLBROOKE approached PLAINTIFF to tell him he needed to get onto another gurney, but PLAINTIFF was unable to breath, was hyperventilating, and had blood and bile stuck in his nose and throat, and had an uncontrollable urge to drink water

12. DEFENDANT HOLLIE HOLBROOKE began to shout at PLAINTIFF to get on another gurney, but PLAINTIFF began to stumble toward the water bubbler, and could only think of water

13. HOLLIE HOLBROOKE began to shout at PLAINTIFF to get away from the water bubbler

14. PLAINTIFF proceeded to drink water, and DEFENDANT HOLLIE HOLBROOKE began to accost PLAINTIFF with clear anger in her demeanor in response to PLAINTIFF not complying with the gurney transfer or her suggestion that it was not time for water

15. PLAINTIFF immediately began to vomit blood and bile, and was unaware as of yet that his nose had been broken with a shod foot, and he was choking on his own blood

16. PLAINTIFF was also unable to see, and was now having severe chest pain, and could feel the pressure in his skull increasing, and was having a hard time understanding anything DEFENDANT HOLLIE HOLBROOKE was saying,

and decided that since she was yelling at him and treating him with a complete lack of concern for his life-threatening injury, that it most likely was not safe to be under her care, and stated "I want to see my physician please", and was shocked to hear DEFENDANT HOLLIE HOLBROOKE refuse, shouting "That's not gonna happen!"

17. PLAINTIFF had already been informed by Medicare that he had the right to the physician of his choice, and had already chosen his primary care physician who had knowledge of PLAINTIFF's multiple physical disabilities, including but not limited to hypogonadism, mild/severe renal failure, COVID-19 contraction with severe cardiac and respiratory complications as direct affect, which present as asthma; chronic pain from invasive back surgery that put PLAINTIFF on workman's composition, for over a year. As such, PLAINTIFF felt threatened again by DEFENDANT HOLLIE HOLBROOKE, and began to have chest pain and blurry vision with black outs, and stated "I'm being seen, and I have a right to the physician of my choice, and I need to see my primary care doctor" and PLAINTIFF began to puke again in the trash, and missed, getting some on the floor

18. As soon as PLAINTIFF looked up from the trash, 5 security officers were there, telling PLAINTIFF he needed to leave the property, or he would be removed by force

19. PLAINTIFF stated he was having chest pains, and couldn't breathe, and that he needed help, but DEFENDANTS repeated to PLAINTIFF that he could go to another hospital if he wanted to, but it that it was not going to be at CATHOLIC MEDICAL CENTER

20. PLAINTIFF restated "My primary care doctor is here, and I have a right to see any physician of my choice, and I am not going anywhere, I am having a heart attack right now! I need to be seen!" and at that point PLAINTIFF became fearful and thought he was going to die out in the street

21. PLAINTIFF was in disbelief as security moved aggressively toward him and began to back up, until all five DEFENDANTS had backed him right out of the door

22. PLAINTIFF began shouting to bystanders for help, and when they looked over DEFENDANT STEPEN SAGE yelled to them that I was a "Scumbag" who had assaulted them and nurses inside the building, and that caused my help to leave, which is when DEFENDANT STEPHEN SAGE pulled out his taser

weapon and pointed it at me, and kept repeating "GET OFF THE PROPERTY NOW!"

23. PLAINTIFF stated he was, and that he was on the sidewalk, and that it is not hospital property, and began filming the entire interaction after that, thinking that one shot from that gun would be fatal, and PLAINTIFF wanted his family to know who did it

24. DEFENDANTS then began to look at one another as if to question if what they were doing on camera shoulda continue on, at which point they retreated, and PLAINTIFF was relieved to have his phone to protect him

25. PLAINTIFF still could not breath and was having chest pain and blurred vision, and severe head swelling, but had dialed the number to the mother of his youngest son, and she was one mile away, and used "Find My I-phone" to figure out where PLAINTIFF was, because PLAINTIFF was afraid DEFENDANTS were going to have him killed by police, and was not even able to process what had just gone on

26. PLAINTIFF was only inside CATHOLIC MEDICAL CENTER for a total of nine minutes, and had been recording DEFENDANT SECURITY GUARDS on the side walk, a well was away from the building, at 10:58pm, and had only just arrived into the ER at 10:44pm.

27. PLAINTIFF arrived at DEFENDANT PARKLAND MEDICAL CENTER in Derry, NH, and was in the building being seen at 11:48pm

28. PLAINTIFF, once arrived, was treated with care, dignity, and respect, and was identified as an "assault victim", with "Trauma to the head", "trauma to the abdomen", "Laceration to left scalp", with "Trauma to the chest", with "suspected loss of consciousness"

29. PLAINTIFF required multiple Emergency Services at that time, and his vitals were taken, his blood labs were taken, a CAT SCAN on his face was done, a CAT SCAN on his head was done, a CAT SCAN on his pelvis was done, X-RAYS were performed, and ULTRASOUNDS were performed on lungs and abdomen; Sodium Chloride, Electrolytes, Oxycodone, and Acetaminophen were administered to PLAINTIFF multiple times

30. PLAINTIFF was found to have severe decreased renal function, abnormal creatine Kinase, due to exertion during the physical assault, and leukocytosis, described as "Likely adrenergic due to sympathetic surge

during altercation", and polycythemia, which causes a thickening of the blood, and can cause stroke or heart attack or both

31. PLAINTIFF was found to have a "deviated septum", a "fractured nasal bone", "Pain in the chest", and "shortness of breath", a "Concussion", and trauma to his scalp that required 9 staples to close, after the bleeding had been stopped and the swelling had gone down

32. PLAINTIFF told every treating DEFENDANT medical professional at PARKLAND MEDICAL CENTER what had taken place at CATHOLIC MEDICAL CENTER and expected that it would be reported under the requirements of "Improper Discharge/Transfer" under the set provisions of the Emergency Medical Treatment & Active Labor Act

33. PLAINTIFF left PARKLAND MEDICAL CENTER on 09/04/2022, at approximately 3:08pm, after a mandatory observation/stabilization period had been completed, which is the law and standard for ER patients who arrive at the Emergency Room Hospital with a possible traumatic brain injury, which may or may not be fatal, if not treated immediately

34. PLAINTIFF called CATHOLIC MEDICAL CENTER on or about 09/10/2022 and began to attempt to get his medical records and the names of the DEFENDANTS on second shift who had violated his rights, as he was well within his rights to do so, and stated that he also would like to speak to who was in charge of DEFENDANT CATHOLIC MEDICAL CENTER, so that he could report his grievances

35. PLAINTIFF was hung up on several times, despite citing his rights to be able to see his medical provider, obtain his medical records, and obtain the names of all individuals involved in his treatment

36. PLAINTIFF was told not to come back into the building by anyone who answered that day, and since PLAINTIFF has asthma, significant back problems, hypertension, severe renal issues, and cardiac related debilitation, PLAINTIFF was afraid to enter the building, as PLAINTIFF believed that a taser could and would kill him, causing cardiac arrest, and PLAINTIFF felt that DEFENDANTS also carried firearms, and was not about to bring a disability to a gun fight, as PLAINTIFF does not carry firearms, and does not know how to use them, nor can PLAINTIFF even breath or move from danger fast enough for safety or defense

37. PLAINTIFF eventually spoke to a woman, who had not given her name, but simply identified herself as the "patient liaison", and she assured me she would listen and did, and was told all the above and more, and PLAINTIFF waited for an answer

38. PLAINTIFF only knew one of the DEFENDANTS names, "Stephen Sage", as DEFENDANT STEPHEN SAGE was the only DEFNDANT who declared who he was, when I asked him on camera, as he had unholstered and pulled his taser gun out, and had pointed it at PLAINTIFF directly at his bad heart, on a public sidewalk, while in the intimidating and life-threatening company of his DEFENDANT coworkers, forcing me off even just a state property public sidewalk, via assault with a deadly weapon, used illegally and feloniously against me for that very purpose and intent

39.     On 09/29/2022, PLAINTIFF was arrested on fictitious and false charges, for stalking –Placing Individual in fear, and two counts of criminal threatening, where the only threat quoted was "intent to file lawsuit" and "Get names of individuals involved" (in violating PLAINTIFF's civil and human rights, as well as his EMTALA protected patient rights, subsequently reenforced and supported by the New Hampshire Bill of Rights)

40.     PLAINTIFF's I-Phone was illegally taken from him as well, as there was a false and highly illegal search and seizure warrant issued by a judge to do so, with zero evidence presented as to why and how that came about, other than DEFENDANT STEPHEN SAGE saying that PLAINTIFF was filming him, and telling him he would be litigating against him in court

41.     PLAINTIFF was ordered to stay in jail over the weekend, as DEFENDANT SECURITY had told DEFENDANT MANCHESTER POLICE OFFICERS that they were "so afraid of PLAINTIFF that they had to take days off from work" and could not function as armed security detail due to fear of disabled PLAINTIFF, who had only been at CATHOLIC MEDICAL CENTER for less than ten minutes, before being denied life-saving medical services, while disabled, and suffering from and open head wound, and violent assault trauma

42.     PLAINTIFF had his oldest son taken from his custody and was subsequently denied his visitation as a direct result of the above

43.     PLAINTIFF being erroneously denied his rights to receive lifesaving medical care, also denied him his rights to access his medical records, which are his property, as well as having also been falsely prohibited from being able to contact any personnel from DEFENDANT CATHOLIC MEDICAL CENTER, including but not limited to PLAINTIFF's primary care physician, WHILST the next nearest and less equip lifesaving facility is over double the distance

44.     On or about 10/10/2022 PLAINTIFF received a physical mail correspondence from DEFENDANT CATHOLIC MEDICAL CENTER and UNKNOWN DEFENDANT identified as the designated Patient liaison dated 10/05/2022, which stated "Thank you for letting us know about your experience at Catholic Medical Center's Emergency Department and Security Department on September 3, 2022. It is never our intention for a patient or family member to leave here feeling the way you did. We value patient and family feedback to make sure we provide the best care possible. A review of your concerns was concluded on October 5, 2022 by both Directors of the Emergency Department and Security Department. After reviewing your concerns opportunities for better communication between nursing staff and patients were identified. Our department, as well as every other hospital department, is currently engaged in strategic training to improve communications with patients and families. CMC and its employees are working every day to better improve communication. Contacting us was beneficial as it allows us to constantly look for ways to improve to ensure our patients and their families experience with us. Every grievance Catholic Medical Center receives is thoroughly investigated. It is however within your rights to pursue other processes in which to file a complaint as well if you choose to do so I have attached the information to this letter. We appreciate

you taking the time to share your concerns with us. Best regards, ILLEGIBLE SCRIBBLE, Patient Liaison, Catholic Medical Center"

45. PLAINTIFF's concerns were not addressed, however, as the incomplete medical information PLAINTIFF had received was full of redacted names which PLAINTIFF needed in order to file any proper complaint or civil remedial action now necessary, on account of PLAINTIFF being disabled and unable to submit the required medical documentation in order to receive his Social Security Disability Income, as PLAINTIFF was coming to a conclusion on his workman's comp arrangements with his EMPLOYER

46. PLAINTIFF's concerns were not addressed in that he had now been COURT ORDERED to not have any further communication with his designated PRIMARY CARE PHYSICIAN employed at CATHOLIC MEDICAL CENTER and had suffered severe financial loss retaining two attorneys for matters arising out of false statements made by UNKNOWN DEFENDANT CATHOLIC MEDICAL CENTER SECURITY STAFF who had conspired with multiple DEFENDANT police officers of DEFENDANT MANCHESTER POLICE DEPARTMENT who had former and current side employment as stand in security for DEFENDANT CATHOLIC MEDICAL CENTER as was admitted by aforementioned DEFENDANT NNTS of the MANCHESTER POLICE DEPARTMENT, in their investigated reports submitted for obtaining falsified probable cause in order to cause a JUDGE to issue a warrant for the intended false arrest, WHICH DID OCCUR, subsequently leaving PLAINTIFF without his I-PHONE where PLAINTIFF had his SOCIAL SECURITY DISABILITY INCOME information stored, as well as evidence of DEFENDANT STEPHEN SAGE assaulting PLAINTIFF on a PUBLIC SIDEWALK with a deadly weapon while DISABLED PLAINTIFF was experiencing a LIFE THREATENING MEDICAL EMERGENCY and attempting to get help

47. On or about 11/15/2022 PLAINTIFF contacted the OFFICE OF THE ATTORNEY GENERAL and FILED A COMPLAINT with the

ASSISTING O IG, whereby PLAINTIFF stated and restated ALL THE ABOVE claims made as FACTS of this case, and had cited SEVERAL INSTANCES of intentionally falsified medical procedures listed as having taken place at CATHOLIC MEDICAL CENTER at times where PLAINTIFF was in all reality receiving lifesaving services at PARKLAND MEDICAL CENTER multiple towns away

48.     On or about 11/20/2022 PLAINTIFF was in FAMILY COURT to address his rights to visitation with his eldest son, and was told that his recent arrest was "evidence of instability" and needed PLAINTIFF to undergo a ONE THOUSAND DOLLAR mental health evaluation, and a ONE THOUSAND DOLLAR hair follicle drug test, because PLAINTIFF's clean blood and urine samples were no longer sufficient in supporting direct evidence of PLAINTIFF's obvious sobriety

49.     On December 1st, PLAINTIFF's attorneys for family court and criminal court recused themselves as PLAINTIFF will not go forth without a proper defense, WHEREBY he chose to disclose to all parties through civil litigation the actual LAWS OF THE LAND which are controlled, enforced, and governed by UNITED STATES COURT, and stopped all pursuits of CRIMINAL COURT, FAMILY COURT, and SOCIAL SECURITY DISABILITY INCOME COURT, to exercise his rights in this UNITED STATES COURT, DISTRICT OF NEW HAMPSHIRE as the totality of mitigating circumstances requires, as PLAINTIFF does not have meaningful access to these LOWER COURTS as their avenues all amount to FIRST AMENDMENT violations of PLAINTIFF's rights to have MEANINGFUL ACCESS to the COURTS to address his Grievances and enforce ACTS of congress to protect PLAINTIFF from further harm to his business, property, and person

CLAIMS FOR RELIEF

1. Emergency Medical Treatment and Labor Act Violations

50.      The Failure of ALL DEFENDANTS involved in PLAINTIFF's treatment or lack thereof at CATHOLIC MEDICAL CENTER presented a substantial mortality risk to PLAINTIFF, who presented with a medical emergency which required a medical screening examination and multiple services, stabilization, and or proper transfer to another facility if not possible.

51.      As a direct result of doing not a single one of these things, PLAINTIFF was severely injured in his business, property, family, person, freedom, and finances, and suffers from PTSD and TBI symptoms, while still being actively prevented from receiving medical treatment and life-saving services at his nearest facility and being denied access to his Primary Care Physician and medical records, which are his property

52.      All DEFENDANTS involved in treating PLAINTIFF at PARKLAND MEDICAL CENTER violated EMTALA when they failed to report CATHOLIC MEDICAL CENTER for improper transfer of PLAINTIFF

53.      All DEFENDANTS employed at CATHOLIC MEDICAL CENTER did discriminate against PLAINTIFF on the basis of his disability and correlating symptoms, of which ALL DEFENDANTS retaliated against PLAINTIFF, essentially denying him emergency life-saving medical services which would have accommodated him and assisted him in his disability, while ensuring his life is saved

54.      All DEFENDANTS employed at CATHOLIC MEDICAL CENTER did discriminate against PLAINTIFF and deny him his right to federally funded services and programs of which PLAINTIFF had every right to enjoy as a MEDICAID recipient, and did discriminate against him on the basis of his disability, falsely misrepresenting PLAINTIFF as competitive, stable, and not needing to be treated in order to do so, and eventually threatening him with a deadly weapon, which would have killed PLAINTIFF if discharged

55.     All DEFENDANTS employed at CATHOLIC MEDICAL CENTER and MANCHESTER POLICE DEPARTMENT did collude and conspire to violate PLAINTIFF's civil rights, when they conducted a false investigation and charged PLAINTIFF with stalking and criminal threatening, while falsely misrepresenting PLAINTIFF as being in and at places he never was, and avoiding speaking to PLAINTIFF directly, in order to steal PLAINTIFF's I-PHONE, conceal PLAINTIFF's medical records, and prevent PLAINTIFF from ever receiving care or his complete record while illegally concealing their own identities

56.     All DEFENDANTS employed at CATHOLIC MEDICAL CENTER and MANCHESTER POLICE DEPARTMENT did retaliate against PLAINTIFF for exercising his rights to investigate, gather names, evidence, records, and litigation related information which is clearly granted under the NEW HAMPSHIRE PATIENT BILL OF RIGHTS, the Emergency Medical Treatment and Active Labor Act, as well as the United States Constitution, and all DEFENDANTS continue to do so at this very moment

57.     DEFENDANT CATHOLIC MEDICAL CENTER as a violating entity, did and does continue to engage in a pattern of racketeering activity, charging for services never rendered, and recording false assessments, tests, and services never done at times PLAINTIFF was at another completely different facility, while preventing PLAINTIFF from receiving his property and records needed to obtain his Social Security Disability Income Claim, and engaging in acts of violence and false arrest, stealing evidence of said same through illegal search and seizure, and preventing PLAINTIFF from seeing his own Primary Care Physician or even life-saving medical services, all the while being fined and convicted on the side under the False Claims Act for similar and stealing from the federal government. PLAINTIFF continues to be assaulted from every direction in his business, reputation, person, family, freedom and finances as he is dragged through multiple COURTS on false charges which arose from false reporting to police

and the federal government in order to cover over evidence of the above.

58.     All DEFENDANTS employed at CATHOLIC MEDICAL CENTER did willfully neglect PLAINTIFF and purposely and intentionally falsely misrepresented PLAINTIFF in his medical records and reports in a way that has literally destroyed PLAINTIFF's life, health, family, freedom, finances, and mental wellness, and continues to do so

59.     All DEFENDANTS employed at CATHOLIC MEDICAL CENTER who hold professional licenses did commit medical malpractice when they violated EMTALA and did lie and attempt to silence PLAINTIFF via false arrest, retaliation, and illegal search and seizure of PLAINTIFF's property which contained evidence of said same

60.     All DEFENDANTS employed at MANCHESTER POLICE DEPARTMENT and CATHOLIC MEDICAL CENTER did conspire to create false probable cause in order to have a warrant issued for PLAINTIFF's arrest, which DEFENDANT STEPHEN SAGE used to cover over his assaulting PLAINTIFF with deadly weapon, while simultaneously making it seem like DISABLED PLAINTIFF was the one threatening and intimidating, and continued to conspire with DEFENDANTS formerly and currently employed at CATHOLIC MEDICAL CENTER as co-working security, for secondary income as DEFENDANTS representing DEFENDANT MANCHESTER POLICE DEPARTMENT to have PLAINTIFF's I-PHONE taken and seized which shows CATHOLIC MEDICAL CENTER security DEFENDANTS threatening and intimidating PLAINTIFF with weapons on a public sidewalk where PLAINTIFF sought help from members of the public, as DEFENDANTS yelled at them to not help PLAINTIFF, and shouted out lies that PLAINTIFF was dangerous and had assaulted hospital staff, causing PLAINTIFF's help to become hostile as well

CAUSES OF ACTION & CLAIMS FOR RELEIF

## A. EMTALA VIOLATIONS

61.     The Failure of DEFENDANT CATHOLIC MEDICAL CENTER to treat PLAINTIFF for a medical emergency upon arrival, provide multiple services for said same, stabilize him, and properly discharge him in alignment with EMTALA did cause PLAINTIFF great harm, and irreversible, irreparable harm, as stated in the facts above, and as a result, PLAINTIFF continues currently to suffer debilitating symptoms of Traumatic Brain Injury, Loss of freedom, loss of visitation with his son, loss of finances, inability to receive life-saving medical care at the closest hospital when the alternative is double the distance, inability to complete Social Security Disability Income Claim, and massive blows to his credibility, character, business, and civil reputation, while bound to several court dates and charges for false reports made in violation of EMTALA by DEFENDANTS employed at CATHOLIC MEDICAL CENTER, in order to cover over their own illegal acts, which caused the state and county criminal courts to participate in further violating my rights to receive medical care and life-saving emergency medical services

62.     All DEFENDANTS employed at PARKLAND MEDICAL CENTER were made aware of improper treatment and transfer of PLAINTIFF by DEFENDANT CATHOLIC MEDICAL CENTER, and had a duty to report said same, and chose not to in violation of EMTALA, further assisting CATHOLIC MEDICAL CENTER in violating PLAINTIFF's rights, and creating further hardship for PLAINTIFF

## RELEIF REQUESTED

63.     WHEREFORE, Plaintiff requests that this COURT grant the following relief:

64.     Declare that DEFENDANT CATHOLIC MEDICAL CENTER is DEFENDANT that violated Plaintiff's federally protected rights outlined under the Emergency Medical Treatment & Active Labor Act, whose DEFENDANT security and medical staff did collectively prevent (1.) Plaintiff from receiving Emergency medical treatment, (2.) Failed to stabilize patient and lied about stabilizing patient at times when Plaintiff was a patient receiving, said services in reality at a separate facility, (3.) and did participate in an improper transfer, which (4.) was not reported by DEFENDANTS employed at PARKLAND MEDICAL CENTER in direct violation of EMTALA

65.     Issue an injunction which lifts PLAINTIFF's prevention order erroneously granted by a in violation of PLAINTIFF's FOURTEENTH AMENDMENT rights to equal protection and due process of law, and making PLAINTIFF a prisoner to provisions which create an EIGHTH AMENDMENT violation in that PLAINTIFF is legally restrained from receiving adequate medical care, and has a multitude of disabilities which debilitate, incapacitate, and retard basic functions.

66.     Declare all reports stemming from DEFENDANT security and medical staff at CATHOLIC MEDICAL CENTER false, and FRUIT FROM A POISONOUS TREE, in regards to probable cause for stalking and criminal threatening, when the only stalking done was PLAINTIFF attempting to obtain his property and see his Primary Care Physician while getting the names of the individuals who violated his rights as he informed openly of his intent to litigate, which was perceived as "criminal threatening", and subsequently was the only quotation made in reports about PLAINTIFF, who was simply exercising his rights on public property, while being denied access to public information and his personal medical records as security staff continued to physically block PLAINTIFF from all access, and use coworker DEFENDANT MANCHESTER POLICE OFFICERS to doctor up

a defense, and steal PLAINTIFF's I-PHONE, without any probable cause or reason listed for such a search and seizure

67.     Declare that DEFENDANTS HOLLIE HOLBROOKE, ALAN FLANAGAN, LEIGH-ANN ALBANESE, STEPHEN SAGE, UNKNOWN, UNKNOWN, UNKNOWN, and UNKNOWN did violate PLAINTIFF's rights under EMTALA when they collectively acted and conspired to prevent PLAINTIFF from receiving emergency life-saving medical services as a medicaid recipient, collectively acted and conspired to improperly transfer PLAINTIFF outside of the facility without treatment, and collectively acted and conspired to ensure PLAINTIFF was not stabilized, while lying and stating that he was at times he was not even at the facility, but at another, and that ALL DEFENDANTS participated in denying PLAINTIFF the physician of his choice, who was just his Primary Care Physician

68.     Declare all DEFENDANTS employed at PARKLAND MEDICAL CENTER had a duty to report improper transfer of PLAINTIFF by DEFENDANT CATHOLIC MEDICAL CENTER, and that DEFENDANTS KHAIRAT ALI, LARRY KESSLER, THOMAS GALLAGAR, MADISON FIASCONARO, UNKNOWN NURSE, and DOCTOR GALTH did all fail to do so

69.     Award PLAINTIFF compensatory civil damages under the following EMTALA analysis:

The Emergency Medical Treatment & Active Labor Act states that as soon as a patient is 250 yards from hospital This Act is in full force and becomes a right of the patient to be treated for a medical emergency. Furthermore, EMTALA also states that Plaintiff had a right to the physician of his choice, who was for all intents and purposes Plaintiff's Primary Care Physician, UNKNOWN, who worked in the building, and had access to knowledge that Plaintiff has symptoms of renal failure, hypertension, cardiac and concentration issues related to contraction or Covid-19, and a surgical history that has left Plaintiff in a disabled and debilitated state, for which he has been unable to retrieve his medical records with a

continuously uncooperative, deceptive, and albeit criminal staff roster, and this has held up Plaintiff's social security disability income claim. Plaintiff was also improperly transferred/discharged, and no receiving hospital was notified.

EMTALA states: "A physician who is responsible for providing an examination or treatment, including but not limited to an on-call physician, may be liable for civil money penalty for signing the medical certificate if he should have known that the benefits of transfer did not in fact out-weigh the risks of transfer, or he misrepresents the patient's condition". All DE receiving hospital who consents to fall under the rules and governing authorities of the EMTALA Act through acceptance of funding from the federal government, it is to report all inappropriate transfers/discharges by the previous treating hospital. In this case, all medical professionals listed as DEFENDANTS in this case violated EMTALA by failure to do so, as soon as Plaintiff informed them of the above, which Plaintiff verifies under oath that he did in this very claim, under penalty of perjury. Furthermore, "A hospital may be held liable to an injured person in a civil action for damages under the statute, with no maximum on the liability", and "Unlike a number of other federal statutes, enabling civil remedy, there is no provision for an award of attorneys fees to a successful Plaintiff, and in this case, Plaintiff MOVES forth THIS HONORABLE COURT PRO SE.


Currently, the penalty for each violation of EMTALA by a hospital with 100 beds or more has been adjusted from $50,000.00 per violation to an inflation adjusted rate of $119,942 per violation pursuant to 42 CFR SubSection 10003.500 for "Refusing to provide either any necessary stabilizing care for an individual presenting with an emergency medical condition that requires such stabilizing treatment, or an appropriate transfer of that individual if that hospital does not stabilize emergency condition, and additionally private citizens who are harmed by a physician's or hospital's failure to provide stabilizing treatment may file a civil suit against the hospital to obtain damages available under the personal injury laws of the state in which  hospital is located, in addition to recouping any equitable relief, as is appropriate under 42 USC Sub-Section 1395 dd(d)(2)(A). In this case, the state of new Hampshire also has no cap on recovery for the above stated instances when it comes to medical malpractice resulting from EMTALA Act

violations, and the Patient Bill of Rights makes it a class B felony to retaliate against a Plaintiff/patient for exercising said EMTALA Act rights, and rights similarly reenforced by NH Patient Bill Of Rights standards and codes, meant to supplement code of federal regulations as cited within the governing RSA classification of said same. In this case, Plaintiff is suffering from continued losses in real time, was falsely arrested due to false Catholic Medical Center reports, had his phone illegally seized due to said same fruit from that very poisonous tree, and subsequently as a direct result lost visitation rights with his son and was erroneously ordered to stay away from accessing the closest life saving, public health facility where his Primary Care Physician is located by a State Court Judge in violation of his Eighth Amendment rights, and the only other closest ER hospital being double the distance. And is currently still unable to obtain said medical records in order to continue with social security disability income claim.

At Catholic Medical Center security guards are hired and trained to follow and understand EMTALA Act protocol and are considered to be public health facility personnel under the NH Patient Bill of Rights. A total of three physicians and five security officers all participated in 4 EMTALA Act violations a piece, creating a total of 32 EMTALA Act civil damage infractions able to be recovered at $119, 942 dollars, for a total compensatory award of:

$3,838,144.00

70. Award EMTALA Act civil monetary damages recovered at $119, 942 for each failure to report improper transfer by all DEFENDANTS made aware through PLAINTIFF's original intake report with DEFENDANT medical staff, six in total, at:

$719,652.00

B. HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT VIOLATIONS

71. DEFENDANTS HOLLIE HOLBROOKE, ALAN FLANAGAN, and LEIGH-ANN ALBANESE all participated in willfully falsifying documents in full knowledge of PLAINTIFF only having been in CATHOLIC MEDICAL CENTER for a total of nine minutes. What All DEFENDANTS did at Catholic Medical Center in terms of misrepresenting Plaintiff to his insurance prodder, is defined as "Tier 4 willful neglect violation not corrected in 30 days, times 4 months, at a maximum imposed penalty of $63,973.00 per violation, with a calendar year cap of $1,919,173 dollars", with a total of three eligible physician DEFENDANTS. As such, Plaintiff request this COURT order the full civil monetary damages recovery of:

$767,676.00

72. Award PUNITIVE DAMAGES to PLAINTIFF, multiplying the total sums of civil infractions by FOUR, for the purpose of punishing DEFENDANT CATHOLIC MEDICAL CENTER, who enjoys a yearly revenue of over 1 billion, and was just hit with $3.8 million as a fine for falsifying medical records and creating kickbacks in order to profit from FALSE CLAIMS and lie to MEDICARE/MEDICAID in order to steal from the federal government, while doing the same to PLAINTIFF, in the face of probable mortality, clearly demonstrating a lack of concern for its financial losses, which do not appear to be significant enough for DEFENDANT CATHOLIC MEDICAL CENTER to stop doing these egregious, and particularly heinous acts against disabled citizens who cannot defend themselves. CATHOLIC MEDICAL CENTER has a policy and practice of hiring individuals who are willing to lie and falsify records, kill people and rewrite how it happened, and just toss disabled citizens into the street with a cracked open skull, broken nose bone, cardiac issues, and significant cardiac debilitation from COVID-19 complications. PLAINTIFF is STILL unable to receive treatment, and CATHOLIC MEDICAL CENTER was just in this very COURT for the same kind of nefarious patterns, and now their security staff are working with fellow staff members who are also police, and who are apparently willing to just lie lie

lie right along with them, without even asking PLAINTIFF a single question, knowing full well PLAINTIFF has every right to exercise his rights.

73. Order that CATHOLIC MEDICAL CENTER be barred from receiving MEDICAID and MEDICARE funding, indefinitely, as well as DEFENDANT GRANITE ONE HEALTH, who is CATHOLIC MEDICAL CENTER and enjoys the same exact CEO, DEFENDANT JOSEPH PEPE

74. Issue an injunction for an estoppel on all criminal matters deriving from declared FRUIT FROM A POISONOUS TREE, and order that there be investigations into DEFENDANT MANCHESTER POLICE DEPARTMENT and its ties to DEFENDANT CATHOLIC MEDICAL CENTER as a weapon to assault citizens who attempt to exercise their rights

75. Issue Injunction ordering CATHOLIC MEDICAL CENTER DEFENDANTS to be restrained from contacting PLAINTIFF or preventing PLAINTIFF from entering CATHOLIC MEDICAL CENTER in any capacity, as is his right

76. Declare that DEFENDANTS employed at CATHOLIC MEDICAL CENTER retaliated against PLAINTIFF for attempting to exercise his rights to his medical records, film operations of criminal infringement of said rights by way of threat, assault, intimidation, false arrest, illegal search and seizure, and malicious prosecutions which further prevent PLAINTIFF from receiving medical care and emergency medical services

77. Declare DEFENDANTS employed at CATHOLIC MEDICAL CENTER and MANCHESTER POLICE DEPARTMENT did conspire to violate PLAINTIFF's civil rights, did violate PLAINTIFF's civil rights, and are currently still violating PLAINTIFF's civil rights, in every way described in this claim in the facts above

78. Grant and award Attorney fees and costs to CLAIM designer, JONATHAN CULLINAN, who hath filed this CLAIM on my behalf, at 1/3 the sum-total of the damages awarded to PLAINTIFF, to be ADDED on top of that sum-total,

79. and not deducted, as there is no cap on these fees in the state of New Hampshire, and specifically for damages incurred via EMTALA and coupled with medical malpractice

80. Issue injunction for the immediate release of PLAINTIFF's I-PHONE, whereby nothing was ever even written or provided in the warrant as to why the phone was even taken, and PLAINTIFF has important medical data

stored there, which he needs in order to continue with his Social Security Disability Income Claim

## C.  CIVIL RICO VIOLATIONS

81. DEFENDANT CATHOLIC MEDICAL CENTER is a well-known entity who finds itself in this COURT often for fraud, and takes deals and settlements without ever admitting wrong-doing, and US attorney RAPHAEL KATZ allowed that, despite the Office of the Inspector General finding so many different acts of falsified records, of which this COURT is well aware. PLAINTIFF has now become a victim of this CMC entity which has just been allowed to go on and continue doing as it pleases. PLAINTIFF contacted the OIG, and PLAINTIFF exercised to exhaustion every available remedy to no avail, while suffering retaliation, and malicious prosecutions under the debilitation and disabling circumstances of a multitude of ailments, including but not limited to Traumatic Brain Injury, which almost completely incapacitates PLAINTIFF's ability to focus or remember things. CATHOLIC MEDICAL CENTER is a criminal enterprise, using law enforcement to cover over its crimes against disabled citizens, and using false reports to take away PLAINTIFF's liberty, ability to defend himself effectively in court, and halt PLAINTIFF's assistance by blocking all access to life saving medical services. CMC is a criminal enterprise that billed for services that never took place, are recorded so erroneously that even a layman can see it, and turned PLAINTIFF's (9) NINE minute stay into a four hour ordeal of fake incidences and services rendered, then billed PLAINTIFF's insurance, effectively extorting federal funding, again, and then retaliating against PLAINTIFF for informing on them and litigating against them. CMC is a criminal enterprise that does back door deals with government prosecutors in a way where, they never have to admit wrong doing, and then they do it all again. PLAINTIFF is beyond injured in his business, and PLAINTIFF has had false charges placed on him, had his I-PHONE 13 taken by an armed SWAT team, assembled against PLAINTIFF in the street, who can barely take a flight of stairs without feeling as though he cannot breathe. CMC is a

criminal organization that hired a firm to investigate and find nothing, as this is what they did when PLAINTIFF exercised said channels, and CMC once again admitted no wrong doing, challenged PLAINTIFF to go about other remedies if he was unsatisfied. DEFENDANT MANCHESTER POLICE DEPARTMENT admittedly allows its officers to work as security alongside CATHOLIC MEDICAL CENTER security, and as such, these DEFENDANTS listed in this CLAIM intentionally assisted CMC in creating a slew of false charges, easily refutable upon interviewing and questioning, which not a single DEFENDANT employed at MANCHESTER POLICE DEPARTMENT ever even attempted to do. To satisfy this RICO CLAIM, DEFENDANTS employed by DEFENDANT MANCHESTER POLICE DEPARTMENT, only requires the conspirator to intend to further an endeavor, which if it were completed, would satisfy the elements of the RICO CLAIM. The fact that PLAINTIFF is never even quoted in any of the reports as having made any threats other than the intent to litigate for damages incurred through his rights being violated, is legally on public property attempting to record crimes being committed against his person, and was never even asked a single question in regard by any DEFENDANT employed by MANCHESTER POLICE DEPARTMENT demonstrates the endeavor furthered. PLAINTIFF has had his phone taken, his son removed from his home, his SSDI blocked, his medical records all incomplete, with redacted names, and the rest not even being given. And MANCHESTER POLICE DEPARTMENT has had PLAINTIFF's I-PHONE 13 for months, and will not give it back, and will not provide a reason why they have it, how they got the warrant for it, or how probable cause to get a search and seizure was even achieved. PLAINTIFF is not being helped or assisted by DEFENDANT MANCHESTER POLICE, and PLAINTIFF is disabled and unable to handle any more stress or loss caused by these DEFENDANT conspirators. DEFENDANTS CMC and MPD have a long-standing history, and together, they did violate PLAINTIFF's rights under RICO, through wanton acts of freedom deprivation in the form of false arrest, assault with a deadly weapon, false police reports, withholding of medical records property, and a collective organization of perpetual fraud that destroys lives. PLAINTIFF is crushed beyond measure, and is still being brutalized, and is without help or assistance despite reaching out in all directions.

RELEIF REQUESTED

82. Declare DEFENDANTS did injure PLAINTIFF in his business, which is now just his body, which is disabled, receiving no accommodation from said disability, and has been further disabled via PTSD symptoms and head trauma left untreated and exacerbated by acts of violence and retaliation against me. PLAINTIFF can't work now if he tried, as PLAINTIFF is unable to focus, remain poised, or maintain just simple balance. Furthermore, PLAINTIFF has lost his ability to even file a claim to be compensated for said disability due to the malicious cooperative racketeering acts of CMC and its colluding muscle and side employees from MPD who often retire into that very same job, as security.

83. Declare DEFENDANTS CMC and MPD as co-conspirators who willfully steal, assault, threaten, arrest, and deprived PLAINTIFF of his property and liberty, and very nearly his life, through a pattern of predicate acts which carry over right into the merits of this CLAIM as it currently stands.

84. Declare PLAINTIFF's business is his body, which is disabled, and compensation available, yet thwarted by CMC and MPD DEFENDANTS.

Award Treble damages in the amounts afforded by this court as it sees fit and just, by calculating the total cost of civil infractions via EMTALA, as PLAINTIFF's business is his person, and his property, which is his acquisition according to federal regulations in regards to SSDI, and triple the original sum total of EMTALA civil infractions from:

$3,838,144.00

To:

$11,514,432.00

As PLAINTIFF cannot put a price on his suffering, and no number listed in this CLAIM does Justice or truly returns the losses PLAINTIFF has suffered in all meaningful and relevant areas of life due to a pattern of allotted and allowed to continue, RACKETEERING by a CORRUPT ORGANIZATION who is the

DEFENDANT CATHOLIC MEDICAL CENTER, undeterred from altering its course of predicate acts of fraud and intentional injury to PLAINTIFF's business and person

85. Order all medical records be surrendered to PLAINTIFF immediately in accordance with HIPAA

86. Order a thorough investigation into DEFENDANT CMC computer database system to once again look for evidence of fraud related to PLAINTIFF, who is the relator and claimant to said such instances of FALSE CLAIMS, and will require 20% of anything recovered as PLAINTIFF is the Whistle Blower, and originator of said claim, and must inform this COURT that he is such in order to receive

87. Award attorneys fees and expenses to CLAIM designer and litigation initiator JONATHAN CULLINAN at 1/3 of what is awarded to PLAINTIFF, plus hourly rate at $100 per hour, 5 hours daily, times 120 days, as additional compensation, to be awarded separately and not out of PLAINTIFF's compensatory damages:

$60,000

On top of 1/3 of EMTALA tally total:

$1,326,587.52

D. AMERICANS WITH DISABILITIES ACT TITLE II

88. All DEFENDANTS including CMC and MPD did discriminate against PLAINTIFF on the basis of his disability, and failed to make any reasonable accommodation for said disability, or accept PLAINTIFF as a person with an emergency medical condition, using his symptoms of debilitating TBI as a catalyst to cast PLAINTIFF into an entirely different light, while lying about his stay and committing fraud after fraud, false statements, fake medical reports, and billing MEDICAID and MEDICARE, while accepting all manner of federal funding which require DEFENDANTS to follow EMTALA guidelines and MEDICAID/MEDICARE standards of treatment and care

89. PLAINTIFF was injured in his freedom, business, person, property, family, and suffers said same currently as a result, and as such requests relief from this Court as is justified and allowed by its federal jurisdiction

90. Declare all DEFENDANTS employed by CMC and MPD as having discriminated against PLAINTIFF, by way of his disability, and denied him access to services without any reasonable accommodations in any way to assist him, effectively leaving him for dead in the street while aiming a weapon at his chest, as PLAINTIFF was experiencing heart attack symptoms with a TBI, and loss of blood from his skull, with vitals that in and of themselves are classified as an emergency, equating to stage 3 hypertension and possible paroxysmal Sympathetic Hyperactivity, which is the leading cause of mortality in patients who show up at the ER with head trauma and vitals displayed by PLAINTIFF

91. Award PLAINTIFF monetary damages which reflect and resemble the EMTALA balance, as it is a real and tangible measurement PLAINTIFF can use to attempt to conceive of a way to make recompense:

$3,838,144.00

E. REHABILITATION ACT OF 1973 SECTION 504

92. DEFENDANTS CMC and MPD did actively conspire to discriminate against PLAINTIFF and deny him his rights to a federally funded program, he was guaranteed to be able to enjoy and partake in, in every way outlined under EMTALA. MPD enjoyed $7.5 million in federal funding this year, and it was used to deny PLAINTIFF his access to these programs meant to serve him, and not be used against PLAINTIFF to discriminate against him, due to his disability, and due to their not wanting to treat it, or acknowledge it, or allow it to be accommodated in order for PLAINTIFF to receive the benefits of these federally funded programs. MPD and CMC even discriminated against PLAINTIFF after the fact, having prevented him from obtaining his medical records which are his property, as well as writing more fictitious reports to have PLAINTIFF placed under a false arrest, and illegally take his I-PHONE, while causing binding legal judgements to be made which further discriminate against PLAINTIFF and bar him from receiving the benefits of

other programs which requires cooperation and acknowledgement of PLAINTIFF as a patient, and not some crazed insane person who just stalks and threatens all day long with zero "quoted" instances listed, aside from the intent to litigate against DEFENDANTS if they continued to blatantly violate his rights and liberty

RELEIF REQUESTED

93. Award PLAINTIFF monetary damages as calculated by EMTALA, for discriminatory acts which have left PLAINTIFF destroyed and almost option-less, aside from this remedy before this court:

$3,834,144.00

F. CONSPIRACY TO VIOLATE CIVIL RIGHTS

94. All DEFENDANTS employed at CMC and MPD Did conspire to violate PLAINTIFF's civil rights, protected under the UNITED STATES CONSTITUTION, and are currently still coercing to do so, and have been very successful at preventing PLAINTIFF from having any kind of meaningful access to the courts, and further crippling PLAINTIFF and his efforts to help himself and his health.

RELEIF REQUESTED

95. Declare all DEFENDANTS employed by cooperating entities CMC and MPD as having conspired to violate PLAINTIFF's civil rights under the United States Constitution, and several supporting legislative Acts which support said same civil rights, when they colluded against PLAINTIFF to prevent his receiving the benefits of said federally funded programming, and retaliated in conspiracy  against PLAINTIFF for asserting his rights under EMTALA and the New Hampshire state Bill of Rights, which entitles PLAINTIFF's every act as acts of a free man who is not to be discriminated against or prevented form receiving life-saving emergency medical services.

96. Award monetary damages and recompense PLAINTIFF by way of the calculated EMTALA sum:

$3,834,144.00

### G. MEDICAL MALPRACTICE

97. PLAINTIFF has suffered severe loss and damage as a result of DEFENDANTS employed as medical professionals at CATHOLIC MEDICAL CENTER, who intentionally violated PLAINTIFF's rights under EMTALA, TITLE II of the ADA, Section 504 of the Rehabilitation Act of 1973, leaving PLAINTIFF full of disparate fear, and outright concerns of mortality. PLAINTIFF asserts and reasserts that the acts done to PLAINTIFF in violation of EMTALA caused permanent and irreparable harm which cannot be fixed or reversed

RELEIF REQUESTED

98. Declare ALAN FLANAGAN, LEIGH-ANN ALBANESE, and HOLLIE HOLBROOKE, as having committed acts of medical malpractice which damaged PLAINTIFF irreparably in every way described above, and violated every EMTALA standard, and every legislative Act meant to reinforce those standards

RELEIF REQUESTED

99. Award PLAINTIFF monetary damages in the amount of:

$3,834,144.00

100.     Award PLAINTIFF's claim designer and litigation initiator 1/3 and attorneys fees of $100 hr at 5 hours daily, for 120 days:

$1,326,587.52

101.     Award other such relief as seen fit by this Honorable court, in order to aid and assist him in his claim so that he may be made whole and display recompense justly deserved, whereby corrupt organizations who swindle

from the federal government and use officers of the law to aid them in doing so, see how well that goes in this COURT

MOTION FOR SUMMARY JUDGEMENT ON PRIMA FACIE EMTALA & HIPAA VIOLATIONS

102.      Now comes PLAINTIFF to move this honorable court to make SUMMARY JUDGEMENT upon all EMTALA and HIPAA Act violations provable on their face with times, dates, signatures, and opposing exculpatory -factual- evidence, of which refute is not at all possible

103.      WHEREFORE, Plaintiff hereby asks this Court to render judgment upon DEFENDANTS acts against PLAINTIFF which are outrageous and detrimental, currently to his health and well-being , freedom, fatherhood, and financial ability to provide and survive, and as such requires requested relief be granted by its merits and clear, and concise omissions of tangible guilt, signed off on and logged into a database via signature and credentials to prove said claims as outright acts of FRAUD, FALSE CLAIMS, and lies which misrepresented PLAINTIFF to the extent of very nearly ending his life. These data entries, to anyone at all reading them, are so blatantly fraudulent and contradictory, that it shocks the conscience of anyone reading it all. And is quite frankly, in believable. See exhibits submitted.

MOTION TO STAY ON MEDICAL MALPRACTICE CLAIM

104.      NOW COMES PLAINTIFF, Leo Cullinan, to move this court to STAY on medical malpractice claims if insufficient as they stand and medical tribunal is needed at the cost of $6,000.00 currently unavailable to PLAINTIFF who is lacking in resources and financial capability, having used the last or his available funds for this CLAIM filing as a last and final form of defense.

105.      PLAINTIFF will allow for more experienced assistance of counsel on the basis of attorneys fees having no cap and available separate from the compensatory damages arising out of the claim itself, as CLAIM DESIGNER and litigation initiator JONATHAN CULLINAN, is not able to litigate this

medical malpractice claim in the usual procedures and methods available as the costs are too high and his time to defend me limited

106.     Therefore, if this court does not find EMTALA violations to be sufficient to prove medical malpractice, and HIPAA violations by the same DEFENDANT doctor, PLAINTIFF will complete this task as the court finds sufficient enough to act and decide upon without rendering the merits moot


107.     PLAINTIFF with this MOTION to STAY submits basic commonsense analysis, understood and mandatorily exercised by all listed DEFENDANT medical personnel employed by DEFENDANT CATHOLIC MEDICAL CENTER, as a matter of course for consideration of MEDICAL MALPRACTICE CLAIM and a supplementation to solidify intent of DEFENDANTS as this COURT may be able to use this to further its own understanding of mindsets in DEFENDANTS who did intentionally conspire to violate PLAINTIFF's rights and cause him purposeful harm and hardship:



VITALS RECORDED BY EMT SERVICES:


BLOOD PRESSURE: 196/172

MEAN ARTERIAL PRESSURE: 180

RESPIRATORY RATE: 22

RESTING HEART RATE: 135bpm

TEMPERATURE: 99.5F


ANALYSIS:

When blood pressure is at the above values, it is indicative of "Hypertension Stage 3", which is described as "The most severe case of high blood pressure that usually needs immediate attention by a doctor or health care professional"; it is also referred to as "Hypertensive Crisis": "If these values come along with symptoms such as headache, nausea, blurry vision or chest pain, the patient is considered to be in a life-threatening situation".

Medical personnel, such as a Registered Nurse or Medical Doctor, are trained, certified, licensed, and retrained in EMTALA ACT standards enough to know that "Hypertensive Crisis" coupled with a TBI after a brutal assault and battery is a life-threatening medical emergency. A layman can see this. Commonsense can verify this. But the CDC and New Hampshire Health and Human Services Division affirm it, validate it, and allow for constant cross reference and consultation.

Classification of "Stage 3 Hypertension" is set by The World Health Organization (WHO), which states that if a patient has a "systolic value" that is over 180 and the diastolic value is over 110 mm Hg, that this is defined as "Hypertensive Crisis". Plaintiff also had a resting heart rate of 135 beats per minute. The American Heart Association defines a normal resting heart rate as being between 60-100 beats per minute, and the regulating authority being The Department of Health and Human Services says that anything over these numbers, at rest, is "life threatening, requires an evaluation by a doctor, and is defined as "tachycardia".

Plaintiff exhibited signs of concussion, hypertensive crisis, mild traumatic brain injury by way of blunt force trauma to the skull with a metal pole, shock, and "Heart Attack Symptoms", outlined by the "Center For Disease Control and Prevention", Under "Heart Attack Symptoms, Risk, and Recovery" on its publicly available website.

As affirmed by Plaintiff, and witnessed and narrated upon by all Defendants listed as medical professionals, patient was "feeling dizzy and nauseas, spitting up blood, and vomiting, over and over again, on the floor, in trash barrels, and in bags", which requires Plaintiff to be seen, tested, and treated by a medical doctor, and as requiring multiple services for assessment and treatment. Plaintiff therefore above and beyond met the standard and requirements outlined under EMTALA as having a medical emergency which needed treatment as also defined and outlined under said same Act. A perfect example of knowledge of this is scene

in the falsified data entries entered into the Catholic Medical Center computer system as seen and provided in this CLAIM as exhibits, where Plaintiff is listed as having been stabilized for the minimum required Four hours outlined by the CDC and released at that four hour end period.  In three separate series of events all seemingly entered at the same time just 15 minutes after Plaintiffs arrival, Defendant Holli Holbrooke achieved the impossible, and had already recorded Plaintiff as both being removed and willingly and perfectly strutting with purpose out the front ER door with security.  In these contradictory paragraphs Plaintiff both demanded treatment and refused it as well, and Defendant Holli Holbrooke warned Plaintiff he needed it, denied Plaintiff access to his own physician, stating "That's not gonna happen" (and logged it), talked Plaintiff down to get his vitals with a charge nurse while Plaintiff was also puking and being "verbally combative" and "verbally assaultive" stating his "intention to sue" if he did not receive medical care, and so on and so forth. However, Plaintiff in reality was only inside Catholic Medical Center for a total of 9 minutes. And during the times falsely entered into Catholic Medical Center data system (and subsequently sent to Medicare/Medicaid as factual), Plaintiff was actually receiving emergency medical services in the ER at Parkland Medical Center in Derry, New Hampshire, quite the ways away from Catholic Medical Center in Manchester, New Hampshire. Where vitals were actually recorded in correlation with actual stabilization. Defendants at Catholic Medical Center declared Plaintiff acuity level 4, stable, and good to go "green", without ever entering any vitals into the system to show it. And this is because that never happened. Nor did any triage take place, which is to decide "when" Plaintiff as a patient is supposed to be seen, not "if", as is defined in EMTALA.

The "Emergency Severity Index" is an important tool used by nurses when assigning "Acuity" to the adult patient, vital signs, potential for threat to life, limb, or organ, and estimated resources needed in treating patient. The CDC guidelines for "Mild Traumatic Brain Injury" set the inclusion criteria for needing a CT scan as far less than the symptoms presented by Plaintiff at CMC ER, as is reflected in the ethical diligence of medical personnel who were actually doing the CT scan at Parkland Medical Center, completely eliminating any room for conjecture, debate, hypothesis or argument.  Plaintiff was described as having been discharged from CMC, willingly, with just a 4-inch laceration on his head, when in reality he was

forced off of the property at gunpoint by five security guards in under ten minutes after arriving in the back of an ambulance. Plaintiff needed 9 staples to close his skull, and received them only after dangerous swelling was able to be slowly and safely brought down, as with a TBI, slowly stabilizing the patient's blood pressure is key, and the minimum for that is 4 hours, which is precisely how long Plaintiff was treated at PMC (Parkland Medical Center).

Parkland Medical Center recognized right away that when a patient shows up at the ED/ER with vital signs Plaintiff had, where patient has suffered multiple blows to the head and body, is in hypertensive crisis, has labored breathing, a cracked open skull, significant blood loss, tachycardia, coupled with a respiratory rate of 22 (tachypnea), and a mean arterial pressure of 180, that this is indicative of "Paroxymal Sympathetic Hyperactivity", which is the leading cause of mortality in intensive care setting, making it very easy to see Plaintiff as the patient was admitted to the ED with a life threatening medical emergency, Acuity Level 2 at the time.

DEFENDANTS involved did so, knowingly, and went above and beyond to lie, violate Plaintiff's rights as a patient and third-party beneficiary of Medicaid/Medicare contract with Catholic Medical Center, and left a heinous trail of evidence indicative of an intentional attempt to cover these Prima Facie facts up.  Furthermore, when a The Emergency Medical Treatment & Active Labor Act states that as soon as a patient is 250 yards from hospital This Act is in full force and becomes a right of the patient to be treated for a medical emergency. Furthermore, EMTALA also states that Plaintiff had a right to the physician of his choice, who was for all intents and purposes Plaintiff's Primary Care Physician, UNKNOWN, who worked in the building, and had access to knowledge that Plaintiff has symptoms of renal failure, hypertension, cardiac and concentration issues related to contraction or Covid-19, and a surgical history that has left Plaintiff in a disabled and debilitated state, for which he has been unable to retrieve his medical records with a continuously uncooperative, deceptive, and albeit criminal staff roster, and this has held up Plaintiff's social security disability income claim. Plaintiff was also improperly transferred/discharged, and no receiving hospital was notified.

EMTALA states: "A physician who is responsible for providing an examination or treatment, including but not limited to an on-call physician, may be liable for civil money penalty for signing the medical certificate if he should have known that the benefits of transfer did not in fact out-weigh the risks of transfer, or he misrepresents the patient's condition". All MEDICAID/MEDICARE receiving hospitals who consent to fall under the rules and governing authorities of the EMTALA Act through acceptance of funding from the federal government, it is to report all inappropriate transfers/discharges by the previous treating hospital. In this case, all medical professionals listed as DEFENDANTS in this case violated EMTALA by failure to do so, as soon as Plaintiff informed them of the above, which Plaintiff verifies under oath that he did in this very claim, under penalty of perjury. Furthermore, "A hospital may be held liable to an injured person in a civil action for damages under the statute, with no maximum on the liability", and "Unlike a number of other federal statutes, enabling civil remedy, there is no provision for an award of attorney fees to a successful Plaintiff, and in this case, Plaintiff MOVES FORTH with his brother, and CLAIM DESIGNER JONATHAN CULLINAN, to initiate litigation on behalf of Plaintiff, LEO CULLINAN, the CLAIMANT

## AFFIDAVIT or DECLARATION

108. Pursuant to 28 USC 1746, I The CLAIMANT and Plaintiff, declare and certify under penalty of perjury that the above numbered factual statements in this CLAIM to be TRUE and ACCURATE

SIGNED:_____

        LEO CULLINAN

DATED:_____

DECEMBER 23,2022


14 Country Club Drive, APT. 25

MANCHESTER, NH 03102